UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD A. CUMMINGS,

      Plaintiff,           CIVIL ACTION NO. 10-11621

      v.                  DISTRICT JUDGE GEORGE CARAM STEEH

COMMISSIONER OF          MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

      Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

###     *A.*    *Proceedings in this Court*

On April 21, 2010, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. No. 1).  Pursuant to 28 U.S.C. §

636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the

purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of

Disability Insurance and Supplemental Security Income benefits (Dkt. No. 3).  This matter is

currently before the Court on cross-motions for summary judgment (Dkt. Nos. 10, 15).

###     *B.*    *Administrative Proceedings*

Plaintiff filed the instant claims on December 22, 2004, alleging that he became unable to

work on January 1, 2003 (Tr. 10, 40-42).  The claim was initially disapproved by the

Commissioner on May 12, 2005 (Tr. 31-35).  Plaintiff requested a hearing and on October 3,

2007, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) Peter N. Dowd,

who considered the case *de novo*.  In a decision dated October 23, 2007, the ALJ found that

Plaintiff was not disabled (Tr. 9-20).  Plaintiff requested a review of this decision on November

13, 2007 (Tr. 7).  The ALJ's decision became the final decision of the Commissioner when, after

the review of additional exhibits[1] (AC-1, Tr. 341-349), the Appeals Council, on March 26, 2010,

denied Plaintiff's request for review (Tr. 2-5).

 In light of the entire record in this case, I find that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled.  Accordingly, it is

**RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's

motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be

**AFFIRMED**.

**II. STATEMENT OF FACTS**

 *A. ALJ Findings*

 Plaintiff was 31 years old on his alleged disability onset date (Tr. 19).  Plaintiff has past

relevant work as an apartment complex maintenance worker, machine operator, tire and lube

technician, assembler, and ski lift operator (Tr. 18).  The ALJ applied the five-step disability

analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial

gainful activity since January 1, 2003 (Tr. 12).  At step two, the ALJ found that Plaintiff had the

following "severe" impairments: (1) degenerative disc disease of the lumbar spine with back

pain; and (2) a bipolar disorder with symptoms of depression and history of suicidal ideation in

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

December 2005 (Tr. 13). At step three, the ALJ found no evidence that Plaintiff's combination

of impairments met or equaled one of the listings in the regulations (Tr. 16).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional

Capacity (RFC) to perform "a range of sedentary exertional work activities that provide for a

sit/stand option. In any potential work setting [Plaintiff] could do no significant pushing and

pulling with the lower extremities. In any potential work setting [Plaintiff] could only do

occasional climbing of stairs, balancing, stooping, kneeling, crouching or crawling. In any

potential work setting [Plaintiff] could be exposed to hazards such as unprotected heights or

moving industrial machinery. From a mental standpoint [Plaintiff] can do simple, routine and

repetitive work activities in a stable work environment and with superficial contact with

supervisors and coworkers and no work with the general public" (Tr. 16-17).

At step four, the ALJ found that Plaintiff could not perform his previous work as an

apartment complex maintenance worker, machine operator, tire and lube technician, assembler,

or ski lift operator (Tr. 18). At step five, the ALJ found that Plaintiff could perform a significant

number of jobs available in the national economy, such as inspector (1,900 jobs), assembler

(3,500 jobs) or machine operator (1,500 jobs) (Tr. 19). Accordingly, the ALJ denied Plaintiff's

claim for benefits.

### B.    *Administrative Record*

#### 1.    **Physical Impairments**

Plaintiff saw neurologist Dr. Karin Fram in January 2005 because of pain (Tr. 130).

Plaintiff's back was tender and stiff, and was worse with straight leg raising (Tr. 130); his motor

and cerebellar functions were normal (Tr. 130). An EMG/NCV test revealed mild irritation to

the S1 nerve root bilaterally (Tr. 131), and an MRI revealed a small disc herniation at L5-S1 (Tr.

331).  The doctor prescribed Plaintiff a muscle relaxant, a steroid pack, and two tablets per day of Darvocet (Tr. 131).  Physical therapy was recommended, but Plaintiff did not have insurance coverage for therapy (Tr. 131).  Dr. Fram advised Plaintiff to avoid heavy lifting, as well as excessive bending and twisting (Tr. 131).

In February 2005, Plaintiff saw neurosurgeon Dr. Malcolm Field, who believed Plaintiff needed a rehabilitative program and possibly surgery (Tr. 329).  Plaintiff did not, however, have any neurologic deficits (Tr. 329).  A note from Dr. Field stated that Plaintiff could not do "manual labor" (Tr. 330).

In March 2005, Plaintiff returned to Dr. Fram, who advised him to avoid traveling long distances and to alternate sitting or standing every 10-15 minutes (Tr. 129).  Eight months passed before Plaintiff saw Dr. Fram again.  In the meantime (April 2005), Plaintiff saw Dr. Richard Kovan at the request of the state agency.  Dr. Kovan reviewed Plaintiff's MRI results and observed that Plaintiff had a fairly normal gait pattern (Tr. 285).  Dr. Kovan reported that Plaintiff could get up on his toes and heels but preferred not to walk; Plaintiff could also squat and come to a standing position (Tr. 285).  Dr. Kovan reported forward flexion of 10-20 degrees, but also noted Plaintiff could flex 90 degrees onto the examination table without discomfort (Tr. 284-85).  Plaintiff could extend his back 10 degrees (with 25 degrees being normal) and could flex left and right 25 degrees (which is normal) (Tr. 287).  Although Plaintiff claimed to have diminished sensation in both legs, his report did not follow any anatomic pattern (Tr. 286).  Straight leg raising tests were negative in the seated position but positive at low angles (10 and 20 degrees) in the supine position (Tr. 286).  Muscle strength was normal.  Dr. Kovan concluded that the examination was "only significant for inconsistencies such as a sensory loss in a nonanatomic distribution, straight leg raising maneuvers and trunk flexibility" (Tr. 286).

-4-

A state agency reviewing physician, Dr. Sadia Shaikh, reviewed the evidence and advised that Plaintiff could do light work (*i.e.*, lift 20 pounds occasionally and 10 pounds frequently, sit for six hours per day and stand for the same amount of time) (Tr. 276). Dr. Shaikh observed that, although Plaintiff claimed greater limitations, Plaintiff's credibility was questionable because of the inconsistencies found by Dr. Kovan as well as the lack of medical treatment (Tr. 280).

In November 2005, Plaintiff complained to Dr. Fram of "terrible pain" and received a nerve block and prescription for tramadol (Tr. 127). Four months later, Plaintiff presented for another nerve block (Tr. 126). In July 2006, Plaintiff returned for a third nerve block (Tr. 125). At that visit, he complained that the tramadol was not helping him, so Dr. Fram re-prescribed Darvocet and added Motrin instead (Tr. 125). She also prescribed physical therapy (Tr. 125). The doctor noted that Dr. Field had recommended surgery but that Plaintiff had declined (Tr. 125).

In January 2007, Plaintiff returned to Dr. Fram's office, complaining that Darvocet was not helping his pain; however, a TENS unit did provide some relief (Tr. 124). The doctor represcribed Darvocet and Motrin, and told Plaintiff to follow up in four months (Tr. 124). Plaintiff did not return to Dr. Fram's office until August 2007, at which time he asked for a nerve block (Tr. 107). The doctor noted a mild limp (Tr. 107). She performed a nerve block and refilled Plaintiff's muscle relaxant, Darvocet, and Motrin (Tr. 107).

### 2.    Mental Impairments

Plaintiff was prescribed the antidepressant Remeron in October 2002 (Tr. 327). In December 2002, Plaintiff reported that he had no complaints except concerns about financial matters (Tr. 327). Psychiatrist Casey Vigor found Plaintiff's judgment and insight to be improving, and as planned started him on a low dose of the mood stabilizer Depakote (Tr. 327).

The doctor explained he had chosen the low dose because Plaintiff anticipated he would be working with power tools and shop machinery (Tr. 327). In January 2003, Dr. Vigor reported that Plaintiff was doing "much better" and had no complaints about his medication (Tr. 325). Plaintiff reported that he was looking for work and asked if his Depakote dose could be increased since it was working so well (Tr. 325).

Plaintiff saw psychologist Rochelle Fisher in February 2005. Plaintiff appeared most concerned about his joblessness, child support arrears, and physical complaints (Tr. 321). Ms. Fisher's mental status exam was "unremarkable" (Tr. 321), and she noted minor dysfunction in some areas of thinking (*e.g.*, insight, judgment, thought content) (Tr. 324). In the area of affect/mood, Ms. Fisher found two minor and one moderate dysfunctions (Tr. 324). She diagnosed Plaintiff with an adjustment disorder with anxiety and depression and recommended outpatient counseling (Tr. 322-23).

In April 2005, psychologist Dr. Matthew Dickson examined Plaintiff at the request of the state agency. Plaintiff's complaints focused on back pain and depression (Tr. 313). Plaintiff admitted that he did not like taking medication, and discontinued taking his Remeron and Depakote due to weight gain (Tr. 313). Plaintiff reported some difficulty in social functioning; while he stated he had problems with authority figures, he reported getting along "OK" with co-workers in the past (Tr. 313). Plaintiff was socially appropriate during Dr. Dickson's examination (Tr. 314). The psychologist reported that Plaintiff "seemed to exaggerate symptoms today, and to under-represent his functioning ability" (Tr. 314). Plaintiff's speech was unimpaired, and his thought content was normal except for thoughts of suicide (Tr. 314). While Plaintiff reported feeling depressed, Dr. Dickson reported that his mood appeared to be normal and that he was "portray[ing] a bitter, self-pitying attitude" (Tr. 315). Dr. Dickson reported a

-6-

mostly normal mental status exam; while Plaintiff identified some states when asked to name five cities and could not do serial sevens, his orientation, memory, abstract thinking, similarities/differences, and judgment were normal (Tr. 315). Dr. Dickson concluded that Plaintiff's "psychological condition would not impair his ability to perform work-related activities" (Tr. 316) and diagnosed a depressive disorder not otherwise specified (NOS) with a GAF score of 55 (Tr. 316).

State agency psychologist Dr. Leonard Balunas concurred with the diagnosis of depressive disorder NOS and concluded that Plaintiff was moderately limited in his ability to maintain prolonged concentration (Tr. 307A). Dr. Balunas concluded that Plaintiff was, however, able to do unskilled work (Tr. 307A). Dr. Balunas did not endorse any significant limitations in understanding, memory, social interaction, or adaptation (Tr. 306-07), finding only mild difficulties with activities of daily living and with social functioning (Tr. 303).

In December 2005, Plaintiff was admitted to Lapeer Regional Hospital due to major depression with suicidal and homicidal ideation and auditory hallucinations (Tr. 190). Plaintiff had not taken his Remeron and Depakote in five months (Tr. 190). A marijuana test was positive (Tr. 191). Plaintiff improved with treatment and was discharged five days later on Abilify and Tegretrol with good mood and no hallucinations or suicidal thoughts (Tr. 185). The diagnosis was a bipolar disorder (Tr. 185).

In February 2006, psychologist Dr. James Grosenbach evaluated Plaintiff (Tr. 180). The psychologist reported test data suggesting that Plaintiff was impulsive and hyperactive, but also quiet, reserved, and private (Tr. 181). Plaintiff's view of what in his life needed to change was noted as: "He needs his disability recognized." (Tr. 182). Plaintiff's complaints to the psychologist were predominately physical, and Dr. Grossenbach wrote that Plaintiff tended to

blame his physical condition for all his problems (Tr. 182).  MMPI-2 results suggested Plaintiff was in emotional distress, had difficulties with concentration and attention, had difficulties with social performance, probably had suicidal ideation, and might have a characterological condition (Tr. 182).  Although Plaintiff had chronic problems, Dr. Grosenbach indicated that his ability to work might not be seriously impaired as long as his job did not involve any appreciable amount of contact with people (Tr. 183).

Plaintiff presented to the Lapeer County clinic in August 2007 as an emergency patient (Tr. 120).  Two days before, Plaintiff had been informed he would have to leave the house which he had been renting for five years (Tr. 120).  Dr. Gail Stankee wrote that Plaintiff had last been seen six months ago and was doing well at that time (Tr. 120).  Since then, Plaintiff had been taking his medication "kind of on and off" (Tr. 120).  Plaintiff reported some difficulties with insurance and his general practitioner declining to prescribe psychiatric medicines (Tr. 120), but he had been able to access treatment for psoriasis (a skin condition) (Tr. 121).  Plaintiff reported problems with auditory hallucinations, depression, and anger (Tr. 120).  During his mental status exam, Plaintiff was friendly, displayed good eye contact, and conversed in an organized manner (Tr. 121).  Although he said he had intermittent suicidal ideation, Plaintiff denied any active suicidal thoughts (Tr. 121).  Plaintiff showed insight into his condition and adequate judgment for personal safety (Tr. 121).  Dr. Stankee wrote that Plaintiff's symptoms had been well-controlled by Abilify and Tegretol without any significant side-effects and accordingly he would prescribe those drugs (Tr. 122).

### C.     Plaintiff's Claims of Error

Plaintiff raises two overarching arguments on appeal:  (1) that the ALJ did not properly assess Plaintiff's complaints of pain, depression, mental limitations and credibility; and (2) that the ALJ failed to pose a complete and accurate hypothetical question to the Vocational Expert.

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)

(the "ALJ's credibility determinations about the claimant are to be given great weight,

particularly since the ALJ is charged with observing the claimant's demeanor and credibility.")

(quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree

is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,

and other evidence."). "However, the ALJ is not free to make credibility determinations based

solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486

F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.

42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely

because it disagrees or because "there exists in the record substantial evidence to support a

different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more

than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241;

*Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of

choice' within which the Commissioner may proceed without interference from the courts."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800

F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *See*

*Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing

the Commissioner's factual findings for substantial evidence, a reviewing court must consider

the evidence in the record as a whole, including that evidence which might subtract from its

weight.  *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both

the court of appeals and the district court may look to any evidence in the record, regardless of

whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

>    **B.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

>    inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and

-12-

considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    *Analysis and Conclusions*

As noted earlier, Plaintiff raises two overarching arguments on appeal:  (1) that the ALJ did not properly assess Plaintiff's complaints of pain, depression, mental limitations and credibility; and (2) that the ALJ failed to pose a complete and accurate hypothetical question to the Vocational Expert.  Each argument is discussed below:

### 1.    **Plaintiff's Credibility**

Plaintiff spends the bulk of his motion for summary judgment criticizing the ALJ's discussion of his daily activities (Pl. Br. 14-17).  Plaintiff avers that the ALJ failed to adequately assess Plaintiff's credibility, specifically as it relates to Plaintiff's complaints of pain.

 The Sixth Circuit has discussed the analytical framework for evaluating subjective complaints of pain:

> First, we examine whether there is objective medical evidence of
> an underlying medical condition.  If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the
> objectively established medical condition is of such a severity that
> it can reasonably be expected to produce the alleged disabling pain.

*Duncan v. Sec'y of Health & Human Servs*., 801 F.2d 847, 853 (6th Cir.1986).  Once the existence of a pain-producing condition is found, the ALJ must determine the intensity and persistence of the pain.  Under 20 C.F.R. § 404.1529, the ALJ must consider several factors, including the objective medical evidence, the activity which precipitates or aggravates the plaintiff's symptoms, the plaintiff's daily activities, the intensity and duration of his symptoms, and medications, treatment and other means to relieve the symptoms.  *See* 20 C.F.R. § 404.1529(c).

-13-

This Court does not make its own credibility determinations. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 528 (6th Cir. 2006). The Court cannot substitute its own credibility determination for the ALJ's. The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed ...." *Kuhn v. Comm'r of Soc. Sec.*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard. "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

The ALJ provided a detailed and lengthy discussion of his reasons for finding that Plaintiff's subjective complaints were not fully credible. Indeed, the ALJ specifically found as follows:

> [Plaintiff's] medications are noted throughout the record. He reported improvement in symptoms with medication. The record does not reflect any complaints of significant side effects or ineffectiveness. As to treatment other than prescribed medications, he has participated in physical therapy and uses a TENS unit with improvement. Surgical intervention was recommended however, [Plaintiff] declined.
>
> With respect to activities of daily living, [Plaintiff] routinely cares for his own personal needs, prepares meals, shops for groceries, vacuums for short periods of time and mows the lawn using a riding mower. He spends time, with his fiancee, watching television, talking on the telephone, and listening to music. Considering the evidence of record, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably

be expected to produce the alleged symptoms, but that [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.  After reviewing the medical record including the testimony at the hearing with respect to the severity limitations and restrictions, the record is not supportive of [Plaintiff's] allegation that his symptoms result in a residual functional capacity, which would preclude him from performing any work.  He engages in daily and social activities. He has not required long-term hospitalization for any physical or mental difficulties.  Although recommended, he declined surgical intervention.  He obtains good relief from prescribed medications when taken as instructed.  The medical record contains no significant complaints of medication side effects or ineffectiveness that might reasonably prevent him from completing an eight-hour workday (Tr. 18).

Each of these findings has factual support in the administrative record, and Plaintiff has failed to point out any instances where the ALJ misstated the evidence.  Plaintiff's alleged errors essentially ask this Court to re-weigh the evidence with respect to portions of Plaintiff's medical history and daily activities and then determine whether it agrees (or disagrees) with the ALJ's credibility determination.  In short, Plaintiff is asking this Court to perform a *de novo* review of the record and re-evaluate her credibility.  It is beyond the scope of this Court's review to perform such a review.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Substantial evidence supports the ALJ's decision, which sets forth a reasonable explanation for discrediting Plaintiff's testimony regarding the severity of his medical condition and resulting limitations.  *See Jones*, 336 F.3d at 476.  The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision.  *See Willbanks v. Sec'y of Health & Human Serv's*, 847 F.2d 301, 303 (6th Cir. 1988).  As the Sixth Circuit explained in *Mullen v. Bowen*, 800 F.2d 535 (6th Cir. 1986):

> The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen*, 800 F.2d at 545. Plaintiff's claim regarding the ALJ's credibility determination should be denied.

Plaintiff also argues that the ALJ improperly discounted Plaintiff's GAF score[2] (Pl. Br. at 17-19). Regarding Plaintiff's GAF score of 45 recorded on August 28, 2007, the ALJ noted that Dr. Stankee recognized that Plaintiff was doing well six months earlier, well enough that his file was closed (Tr. 18). First, it must be noted that this GAF score was reported nearly nine months after Plaintiff's insured status expired. Plaintiff's insured status, for purposes of being entitled to receive disability insurance benefits, expired on December 31, 2006 (Tr. 10). *See* 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); *see also* 20 C.F.R. § 404.130 (In order to qualify for disability benefits, a claimant must have disability insured status). The expiration of Plaintiff's insured status is also known as his "date last insured." Thus, for purposes of disability insurance benefits, Plaintiff bore the burden of showing that he became disabled prior to his date last insured of December 31, 2006. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990), (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)) (claimant must show that he became disabled on or before his

---

[2] The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 fn. 7 (6th Cir. 2006).

date last insured).  Furthermore, Plaintiff was seen by Dr. Stankee on an emergency basis two

days after being informed that he would have to leave the house at which he had been staying for

five years (Tr. 122).  Plaintiff's mental health status so soon after this potentially traumatic event

does not necessarily reflect his condition prior to when his insured status expired, on December

31, 2006.  Furthermore, Dr. Stankee further observed that Plaintiff's symptoms were well

controlled on medication when he was taking it (Tr. 122), a conclusion echoed by the ALJ (Tr.

18).  Taken together, these statements support the ALJ's conclusion that Plaintiff's mental status

in August 2007 was not particularly indicative of his status before or after that date.

        Finally, there is no "statutory, regulatory, or other authority requiring the ALJ to put stock

in a GAF score in the first place." *Kornecky v. Comm'r of Soc. Sec.*, 2006 WL 305648, at *11

(6th Cir. Feb. 9, 2006).  The Sixth Circuit has repeatedly upheld ALJ decisions denying benefits

where a GAF score of 50 or below was reported. *See DeBoard v. Comm'r of Soc. Sec.*, 2006 WL

3690637 at *4 (6th Cir. Dec. 15, 2006) (collecting cases); *Turcus v. Soc. Sec. Admin.*, 2004 WL

2203545 at *2 (6th Cir. Sept. 17, 2004) (affirming ALJ finding of non-disability despite treating

psychiatrist's GAF score of 35).  The GAF score reflects the patient's symptom severity or level

of functioning, whichever is worse.  *See* DSM-IV at 33; *Kornecky*, 2006 WL 305648 at *10.

Here, a GAF score between 41 and 50 indicates serious symptoms or any serious impairment in

social, occupational, or school functioning.  *Id.* at 34.  Plaintiff qualified for a low GAF score

based on his hallucinations and intermittent suicidal ideation alone, so the score did not

necessarily reflect his level of functioning even at the time of evaluation. DSM-IV at 33 (noting

that an individual who hears voices could be appropriately rated in the 31-40 category) & 34

(listing suicidal ideation as a severe symptom justifying a GAF score in the 41-50 range).  In

sum, the ALJ was entitled to find that Plaintiff's GAF score of 45 in August 2007 did not

establish disability.

## 2.      Hypothetical Question

Plaintiff next argues that, because in the preliminary assessment of the severity of his mental impairments the ALJ found that he was "moderately" impaired in concentration, persistence, or pace, the ALJ's RFC finding and matching hypothetical question, restricting Plaintiff to "simple work," was inadequate (Pl. Br. 20-22).

As to an allegedly disabling mental impairment, the Commissioner has promulgated a special technique to ensure that all evidence needed for the evaluation of such a claim is obtained and evaluated.  This technique was designed to work in conjunction with the sequential evaluation process set out for the evaluation of physical impairments.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  Congress laid the foundation for making disability determinations when mental impairments are involved in 42 U.S.C. § 421(h), which provides:

> An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Section 404.1520a explains in detail the special procedure and requires the completion of "a standard document outlining the steps of this procedure."  20 C.F.R. § 404. 1520a(d).  The regulation further requires the standard document to be completed and signed by a medical consultant at the initial and reconsideration levels, but provides other options at the administrative law judge hearing level.  *Id.*  Under this procedure, the Commissioner must first make clinical findings, as to whether the claimant has a medically determinable mental disorder specified in one of eight diagnostic categories defined in the regulations.  *See Merkel v. Comm'r of Soc. Sec.*, 2008 WL 2951276, *10 (E.D. Mich. July 29, 2008), citing, 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A.

The Commissioner must then measure the severity of any mental disorder; that is, its impact on the claimant's ability to work.  "This is assessed in terms of a prescribed list of functional restrictions associated with mental disorders."  *Merkel*, at *10, citing, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C.  The first area of functional restriction is "activities of daily living."  This area requires the Commissioner to determine the claimant's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills. *See Merkel*, at *10.  Under the second functional area – "social functioning" – the Commissioner must determine whether the claimant can interact appropriately and communicate effectively and clearly with others.  *Id.* The third functional area – "concentration, persistence, or pace" – refers to the claimant's ability to sustain focused attention sufficiently long to permit the timely completion of tasks found in work settings.  *Id.*  The final functional area, that of "deterioration or decompensation in work or work-like settings," refers to the claimant's ability to tolerate increased mental demands associated with competitive work.  *Id.*

The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: none, mild, moderate, marked, and extreme.  *See Pauley v. Comm'r of Soc. Sec.*, 2008 WL 2943341, *9 (S.D. Ohio July 30, 2008).  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more.  *Id.* "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  *Pauley*, at *9, citing, 20 C.F.R. § 404. 1520a(c)(4).  Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe.  *Pauley*, at *9, citing, 20 C.F.R. § 404.1520a(d)(1).  If the first two functional areas receive ratings of "none" or "slight," the third rating of "never" or "seldom," and the fourth a rating of "never," the Commissioner will conclude that the mental impairment is

not severe, and that it cannot serve as the basis for a finding of disability. *Merkel*, at *10, citing, 20 C.F.R. §§ 404.1520a(c)(1), 404.1521.

If the functional areas indicate that the mental impairment is "severe," the Commissioner must decide whether it meets or equals a listed mental disorder. *See Merkel*, at *10, citing, 20 C.F.R. § 404.1520a(c)(2). The Commissioner will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the criteria have been met. *See Merkel*, at *10, citing, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02, *et. seq*. If the severe mental impairment does not meet a listed mental disorder, the Commissioner must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. *See Merkel*, at *10, citing, 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

The undersigned concludes that the ALJ's determinations regarding Plaintiff's mental impairments are fully supported by the substantial evidence in the administrative record. In this matter, the State Agency examiner specifically stated that Plaintiff is "moderately limited in his ability to maintain prolonged concentration. **Despite this limitation, he is able to perform unskilled work**" (Tr. 307A) (emphasis added). This finding is not significantly different than the hypothetical question the ALJ relied on, which limited Plaintiff to "simple, routine and repetitive work activities in a stable work environment..." (Tr. 389). The present case is thus distinguishable from *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010), where the State Agency examiner found that the plaintiff was limited to "[two-hour] segments over an eight-hour day where speed was not critical." In *Ealy*, the Sixth Circuit found that the ALJ erred by not including these specific pace-based restrictions in the controlling hypothetical. By contrast, the State Agency examiner's opinion in this case was not as restrictive as the

-20-

examiner's opinion in *Ealy*, but rather the examiner in this case explicitly stated that Plaintiff retained the ability to do "unskilled work," despite his limited ability to maintain concentration.

Moreover, decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work. *See e.g., Latarte v. Comm'r of Soc. Sec.*, 2009 WL 1044836, *3 (E.D. Mich. April 20, 2009); *Street v. Comm'r of Soc. Sec.*, 390 F.Supp.2d 630, 638 (E.D. Mich. 2005), citing, *Chafin v. Comm'r of Soc. Sec.*, 2005 WL 994577, *2, 4 (E.D. Mich. April 26, 2005) (ALJ's hypothetical question addressed plaintiff's mental deficiencies sufficiently by limiting him to "simple, unskilled work." Further, although the plaintiff had "moderate" deficiencies of concentration, persistence, or pace he could nonetheless perform the work of an assembler, packager, inspector, and security monitor); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 662 (E.D. Mich. 2004) ("ALJ took into account [the] [p]laintiff's depression ... by including limitations within the hypothetical ... limiting the possible jobs to simple, unskilled, and routine work"). The undersigned concludes that the ALJ's hypothetical question properly took into account Plaintiff's mental impairments, as found by the ALJ to be credible. Thus, there is no basis for overturning the ALJ's decision, which the undersigned finds is supported by substantial evidence.

## III.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated: July 19, 2011

## *Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 19, 2011, by electronic and/or ordinary mail.*

s/Barbara M. Radke
*Judicial Assistant*